## THE BAKER.

### WINSLOW and others *v.* THE BAKER, her Cargo, etc.

*(Circuit Court, S. D. New York.* November 12, 1885.)

1. SALVAGE—AWARD—APPEAL TO CIRCUIT COURT.
     The allowance of salvage is necessarily largely a matter of discretion, which cannot be determined with precision by the application of exact rules, and appellate courts are not disposed to interfere with decrees in salvage cases merely because the sum allowed the salvors is larger than the appellate court would have allowed.

2. SAME—AMOUNT OF AWARD, HOW DETERMINED.
     Neither the value of the property imperiled, nor the exact quantum of service performed, is a controlling consideration in determining the compensation to be made. The peril, hardship, fatigue, anxiety, and responsibility encountered by the salvors in the particular case, the skill and energy exercised by them, the gallantry, promptitude, and zeal displayed, are all to be considered, and the salvors are to be allowed such a generous recompense as will encourage and stimulate similar services by others.

3. SAME—TUG TOWING BURNING SCOW LOADED WITH COTTON FROM SLIP INTO RIVER.
     Under the circumstances of this case, *held,* that a tug that towed a burning scow, worth about $3,000, loaded with cotton, valued at about $29,000, from a slip where she caught fire out into the river, and to another pier, where the fire was extinguished by the fire-boats, was sufficiently recompensed by allowing the sum of $350, of which $150 should go to the owner of the tug, and the remainder be apportioned among the master and crew.

Appeal from District Court. S. C. 23 Fed. Rep. 109.
*Wilhelmus Mynderse,* for appellants.
*Alexander & Ash,* for appellees.

WALLACE, J. Upon the circumstances in this case it should be held that the salvage services for which this suit was brought will be fairly compensated by a very moderate award. The lighter Baker, a scow with motive power, was discharging her cargo, consisting of bales of cotton, upon the dock of the Cunard Steam-ship Company when a fire broke out in her cargo. She lay in a slip crowded with other vessels, with the steam-ship Servia at her port side, and another lighter, also loaded with cotton, along-side and made fast to her starboard side. The fire occurred about noon. Appliances were at hand for extinguishing the fire, and were immediately brought to bear. The dock was equipped with a stationary engine capable of throwing 350 gallons of water a minute in several streams from 1,300 feet of hose, besides five hydrants for Croton water, with necessary hose, and three Ætna fire extinguishers, and three dozen hand grenades. There were also appliances for signaling the fire department,

and the signal had been given before the libelants appeared upon the scene. The steam-ship Servia was equipped with a steam-pump and ample hose for extingushing fires. As soon as the fire was noticed the stationary engine on the dock was started, and two streams of water were put upon the lighter, and two other streams were likewise brought upon her from the Servia's apparatus. Although the fire was measurably controlled by these appliances it was not subdued, and the superintendent of the dock, fearing, doubtless, that the fire would be communicated to the other vessels in the slip, hailed the tug Lyndhurst, then lying near by, with directions to remove the lighter from the slip. The libelants are the owners, master, and crew of the Lyndhurst. The tug immediately hauled the lighter out into the river and held her there for a few minutes, playing upon her in the mean time a stream of water from her deck hose, until the city fire-boats, the Zophar Mills and the Havemeyer, arrived. As soon as the fire-boats arrived they went along-side the lighter and emptied upon her 10 or more streams of water while the Lyndhurst towed her to Fifty-seventh street, at which place her cargo was removed. A cotton fire can be smothered, but will remain in a smoldering condition until the bales are removed and treated separately. It was necessary, therefore, to take the lighter to Fifty-seventh street. The value of the cotton saved was $29,000; the lighter was worth about $3,000.

It is quite clear that the fire had not been satisfactorily subdued at the time the libelants were called upon to remove her from the slip, but was burning so vigorously as to excite the apprehension of spectators for the safety of the surrounding shipping. The master of the lighter was absent at dinner, and the only hand on board assisted the crew of the tug in their efforts to remove the lighter from the slip. It was a prudent and necessary act, in view of the danger to the other vessels in the slip, to remove the lighter as speedily as possible. It may be doubted, however, whether the lighter and her cargo were much benefited by the service, beyond the towage, which was necessary in order to effect their removal to a suitable place for the special treatment of the cargo. In the interval which elapsed before the arrival of the boats of the fire department, the lighter was beyond the range of the fire apparatus by which she was protected measurably while in the slip, and no protection was afforded to the lighter and her cargo except by the inadequate appliances of the tug. During this interval the fire doubtless increased, and the cargo sustained a corresponding injury. When the boats of the fire department did arrive, however, they were enabled to act more expeditiously and advantageously than they could have done if the lighter had remained in the slip, surrounded by other vessels and comparatively inaccessible. So, also, while the lighter was being towed to Fifty-seventh street, during a period of about two hours, the men on the boats of the fire department, instead of being occupied partly in tow-

ing her, were able to give more exclusive attention to the work of extinguishing the fire. For these reasons it is probably fair to assume that the ultimate loss to the cargo was less than it would have been if the lighter had not been assisted by the Lyndhurst.

Although compensation for salvage services does not inure to persons who are under a legal duty to perform them, and none, therefore, can be claimed by the officers and employes of the fire department, nevertheless, the value of their services, as well as the value of the services rendered by those engaged in suppressing the fire before the tug was called, must be taken into account as though the reward was to be apportioned among the different salvors according to the merit of each. The diminished loss which resulted from the services of the libelant is the proper basis for their compensation, so far as the value of the property saved is an element of an award for salvage. How much that is in the present case it is difficult to determine; but obviously the services of the libelant contributed in a comparatively insignificant degree to the total salvage. These services were promptly and zealously rendered, but they were of short duration, and, after the arrival of the fire-boat, were not materially different from those incident to an ordinary towage service. During the two hours occupied by the services the libelants exerted themselves faithfully, but what they did did not involve any appreciable danger or hardship to themselves, nor even any unusual responsibility, except for the few moments before the fire-boats arrived. For usual towage services the tug and her crew received compensation at the rate of from $10 to $15 per hour. The tug was somewhat blistered by the heat, and somewhat bruised by contact with the Zophar Mills, but her injuries were inconsiderable. Some of the men got more or less wet in the service.

The district court decreed for the libelants the sum of $750. New testimony introduced upon this appeal modifies somewhat the aspect of the case as it was presented in the district court, more especially in regard to the extent of the peril to which the lighter and her cargo were exposed at the time the tug came to their assistance. Were it not for this testimony, the award made by the district court would be reduced reluctantly by this court, if reduced at all. The allowance of salvage is necessarily largely a matter of discretion, which cannot be determined with precision by the application of exact rules. Different minds, in the exercise of independent judgment upon the same evidence, seldom coincide exactly in their view of the facts, or give the same prominence to the varied elements which make up the case. An approximate concurrence is all that can be expected. For this reason, appellate courts are not disposed to interfere with decrees in salvage cases, merely because the sum allowed the salvors is larger than the appellate court would have allowed; and the circuit courts of the United States are influenced by this view. *The Emulous*, 1 Sum. 214.

It is urged for the libelants that the decree of the district court awarded a much smaller percentage to the salvors upon the value of the property than is usually allowed according to the decisions. Courts do, "to a certain and limited extent," to quote the language of Dr. LUSHINGTON, "take into consideration the value of the property saved, in assessing salvage compensation, with the view of making the general rate of compensation sufficient to induce persons to undertake salvage service, and, as it were, making up in cases of large value for the impossibility of giving a complete and adequate reward in cases of small values." *The Henry*, 2 Eng. Law & Eq. 567. As is said by BRADLEY, J., in *The Suliote*, 5 Fed. Rep. 99, 102: "The allowance of anything like a uniform percentage on the value saved in such cases would be attended with inequality and injustice." Neither the value of the property imperiled nor the exact quantum of service performed is a controlling consideration in determining the compensation to be made. The peril, hardship, fatigue, anxiety, and responsibility encountered by the salvors in the particular case; the skill and energy exercised by them; the gallantry, promptitude, and zeal displayed,—are all to be considered, and the salvors are to be allowed such a generous recompense as will encourage and stimulate similar services by others. Each case is distinguished from others by circumstances peculiar to itself, and reported adjudications seldom meet the facts of the particular case before the court. As has been said, although the value of the property menaced by the fire was quite considerable, the amount of loss saved to the owners by the exertions of the libelants was small. Although it was very desirable, in the interest of others whose property was more or less exposed to danger by the fire, to remove the lighter immediately, the risk incurred by others is not a fair element of the value of the services rendered. The salved property is not to be charged upon the theory of benefit to third persons.

Under all the circumstances it is considered that the libelants will be liberally recompensed by allowing them the sum of $350, of which $150 should go to the owner of the tug, and the remainder be apportioned among the master and crew. A decree is ordered accordingly, with costs to the libelant in the district court, and without costs to either party in this court.